## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Dec 14 2016, 7:57 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT
MOTHER

Renee M. Ortega
Lake Superior Court, Juvenile Division
Public Defender's Office
Crown Point, Indiana

ATTORNEY FOR APPELLANT
FATHER

Deidre L. Monroe
Lake Superior Court, Juvenile Division
Public Defender's Office
Gary, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Robert J. Henke
David E. Corey
Deputy Attorneys General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In the Matter of the Termination of the Parent-Child Relationship of P.W., Father, and T.Y., Mother, and R.Y., T.Y., & T.C.Y., Minor Children,<br><br>P.W. and T.Y.,<br><br>*Appellants-Respondents,*<br><br>v. | December 14, 2016<br><br>Court of Appeals Case No. 45A03-1605-JT-1167<br><br>Appeal from the Lake Superior Court<br><br>The Honorable Thomas P. Stefaniak, Jr., Judge<br><br>Trial Court Cause Nos. 45D06-1410-JT-233 45D06-1410-JT-234 45D06-1410-JT-235 |

Indiana Department of Child
Services,

*Appellee-Petitioner.*

**Kirsch, Judge.**

P.W. ("Father") and T.Y. ("Mother") separately appeal the juvenile court's order terminating their parental rights to their children R.Y. and T.Y. Mother also appeals the termination of her parental rights to T.C.Y. Parents raise the following consolidated and restated issue:

> I. Whether the juvenile court's order terminating Father's parental rights to R.Y. and T.Y. and Mother's parental rights to R.Y., T.Y., and T.C.Y (collectively, "Children") are clearly erroneous.

Mother, alone, raises the following restated issue:

> II. Whether Mother's trial counsel was ineffective.

We affirm.

## Facts and Procedural History

Mother and Father (together, "Parents") are the biological parents of R.Y., who was born on January 19, 2011, and T.Y., who was born on May 15, 2012.

Mother is also the biological mother of T.C.Y., who was born on May 31, 2008.[1] In the early morning hours of February 15, 2013, the Indiana Department of Child Services ("DCS") received a call from the East Chicago Police Department ("ECPD") regarding Children being left at home alone. At that time, Children were four years, two years, and nine months of age.

Earlier that evening, an ECPD officer had responded to Mother's call that she and Father were fighting. During the dispute, Father had left, and Mother, concerned he was going to slash the tires on her car, called the police. The officer assured Mother, who was under the influence of alcohol, that her tires had not been slashed. Shortly thereafter, the same officer was again on patrol when he saw Mother at a neighborhood gas station putting air in her tires. Knowing that Mother had been the only caretaker at the home, the officer detained Mother, while other officers went to Mother's home. There, they discovered Children alone and awake. Mother was arrested for public intoxication and remained in jail for two or three days. DCS Family Case Manager Veronica Martinez ("FCM Martinez"), responding to ECPD's call to assess the situation, arrived at Mother's home around 2:00 a.m. and found the home in "disarray," and the refrigerator knocked over onto its side. *Tr.* at 11. Efforts to find someone to care for Children were unsuccessful, and Children were removed from the home and placed in foster care.

---

[1] Father's brief mistakenly states that he is the Father of all three children. However, DNA testing eliminated Father as the biological father of T.C.Y. The identity of T.C.Y's father is unknown.

On February 19, 2013, DCS filed a petition alleging Children were children in need of services ("CHINS") based, in part, on Mother's arrest for public intoxication and Children having been left alone at home at such young ages. A hearing was held that same day, and Mother admitted to the material allegations of the CHINS petition. Children were adjudicated CHINS and ordered to remain in foster care as temporary wards of DCS. At that time, the CHINS court ordered Mother to participate in and comply with services, including, drug and alcohol evaluations, clinical assessments, parenting assessments, and supervised visitation. Mother was also ordered to submit to random drug screens. While Father initially denied the CHINS allegations, the CHINS court adjudicated Children were CHINS as to Father when he failed to appear at a March 2013 fact-finding hearing. At that time, the court ordered him to participate in the same services previously ordered for Mother. During a July 2014 permanency hearing, the CHINS court approved concurrent permanency plans of reunification and adoption. About one year later, the CHINS court changed the permanency plan to adoption.

Meanwhile, in May 2015, DCS filed petitions to terminate Parents' parental rights to their respective children. The juvenile court held an evidentiary hearing on the termination petitions in April 2016 at which Mother, Father, FCM Martinez, Caring Corner therapist Sharon Parker ("Therapist Parker"), and DCS Family Case Manager Darren Washington ("FCM Washington") all testified. FCM Martinez testified that she spoke with Father a few days after Children were removed, and he reported that Mother was drinking on the night

in question and "when she drinks, she gets argumentative." *Tr.* at 13. Father had been arrested before for domestic violence against Mother and admitted to FCM Martinez that he left the home after Mother called the police because he was concerned about again being arrested for domestic violence. *Id.* at 13, 18.

[7] FCM Martinez testified that Mother told her that Children had not been left alone, instead, a neighbor had agreed to "watch the children, but not in [Mother's] home. [The neighbor] would *visually* check on the home" from her own home across the street. *Id.* at 14 (emphasis added). FCM Martinez learned from police that no one was checking on Children. FCM Martinez testified at the April 2016 hearing that it is customary in each case to look at a parent's prior child protective services history and criminal history to understand the situation. In this case, FCM Martinez noted that Mother had two older children who were living with their father. Additionally, there had been an Informal Adjustment in June 2012 regarding Parents' youngest child, T.Y., the details of which FCM Martinez could not recall. FCM Martinez recommended, and the CHINS court ordered, Parents to participate in clinical assessments, parental assessments, supervised visitation, and substance abuse assessments.

[8] Evidence was also presented that, in 2013, DCS had referred Mother to Therapist Parker, who provided Mother with individual therapy and substance abuse therapy for over two years (ending July 2015). Therapist Parker testified that Mother resisted treatment, believing that Children should never have been removed from her home and denying that she had issues "she needed to work

on." *Tr.* at 29-30. About six months later, Therapist Parker found that the program was not going well and identified various obstacles, including, Mother's denial of being accountable for poor decision making, Mother's "cognitive deficits," and Mother's inconsistency with taking medication prescribed to stabilize her mood. *Id.* at 31-33, 37. Additionally, Therapist Parker noted that Mother's relationship with Father was "toxic" because both had a history of substance abuse, which meant that they could thwart each other's attempt to "get clean." *Id.* at 35. Therapist Parker testified that Mother had no "true progression" with therapeutic services over the next year and a half. *Id.* at 38. While recognizing that Mother attended a group to address substance abuse issues, Therapist Parker confirmed that Mother continued to have relapses. In fact, Mother was charged with alcohol-related offenses, and she had used marijuana on the day before the termination hearing. *Id.* at 39, 100. Therapist Parker noted that Mother was not "making much better decisions than when [Therapist Parker] first started working with her." *Id.* at 39. Therapist Parker agreed that Mother had plenty of time and opportunities, and was able to meet with Therapist Parker, but despite all of that "we are kind of right where we started." *Id.* at 43. By the time therapy ended, Mother still had not admitted that she had a problem. *Id.* at 44.

[9] Father also had been referred to Therapist Parker, who identified issues that Father needed to work on, including anger and alcohol abuse. *Id.* at 41. Therapist Parker testified that Father lived in Illinois and was inconsistent in attending services, even though she offered to meet him in Illinois. He also did

not respond to her calls. Therapist Parker stated that Father was involved when he attended therapeutic services, but his attendance was too inconsistent. She opined that Father had made no real progress.

[10] In February 2014, FCM Washington was assigned to work on concurrent plans of reunification and termination. He testified that his focus was Children's safety, stability, and permanency, and he tried to keep Parents compliant with the case plans. *Id*. at 172. Initially, the plan for Children was reunification with Father. Father was given the opportunity to participate in numerous services, but he failed to participate consistently. *Id*. at 174. FCM Washington learned that Father did not have a job or means of transportation. *Id*. at 177. FCM Washington told Father "he needed to comply with services in order . . . to move forward," but Father "disappeared" and disconnected his phone. *Id*. Father did not get in touch with FCM Washington again until November or December of 2014, after Father learned that DCS had filed a petition to terminate his parental rights. *Id*.

[11] Father was unsuccessful in complying with services, and the juvenile court changed the permanency plan from reunification with Father to reunification with Mother. *Tr*. at 174. FCM Washington testified that Mother, initially, was able to "go through parenting and then parenting interaction with the [C]hildren. She was taking drug screens." *Id*. at 175. Abuse of alcohol became an issue for Mother and, at the time of the April 2016 fact-finding hearing, she had two pending cases for alcohol-related offenses in East Chicago. *Id*. at 175-76. Initially, parenting education was provided by Kitty Taylor ("Taylor").

FCM Washington testified that when he or Taylor visited, Mother had the habit of answering the door late or not at all. *Tr.* at 179. During the CHINS and termination proceedings, Mother had positive screens for alcohol. *Id.* At one point, FCM Washington and Therapist Parker spoke with Mother about the option of inpatient treatment as a means to address her persistent problem with alcohol abuse, drugs, and rage. *Id.* FCM Washington opined that Mother's condition was serious enough to warrant such treatment, but Mother was "vehemently" against it. *Id.* at 179-80.

[12]     During the entire month of April 2015, Mother did not participate in services. *Id.* at 181. She also did not see Children because she refused to answer the door when Taylor brought them for a visit. *Id.* FCM Washington stated that it was difficult to bring about reunification because Mother had made insufficient progress on the issue of substance abuse as revealed by her two arrests (March 2014 and April 2015) for public intoxication. Furthermore, although Mother had been referred to a psychiatrist who prescribed medication to stabilize her mood, Mother refused to take the medication "because she didn't know why she even had a DCS case in the first place." *Id.* at 184. At Mother's request, FCM Washington removed Taylor from the case and replaced her with Kimberlee Woods ("Woods"). Mother made no dramatic improvements and still refused to answer the door when Woods brought Children for visitation. Moreover, Mother again tested positive for alcohol and synthetic marijuana. *Id.* at 185. FCM Washington stressed to Mother the importance of no longer using drugs.

[13] FCM Washington testified that, although Mother initially did well with services, there was a sharp decline in cooperation once Mother resumed contact and communication with Father. *Id*. at 188. It was FCM Washington's opinion that inpatient treatment could have worked, but Mother rejected that option twice. *Id*. at 188-89. FCM Washington maintained that, such treatment would have taken Mother away from the neighborhood environment and influences that were harmful to her. He opined, "I think those influences are going to continue to be there and [Mother] hasn't done anything to prevent those influences from coming in and taking over." *Id*. at 189-90.

[14] In light of Mother's consistent substance abuse, her continued volatile relationship with Father, and her "consistent negative behavior," FCM Washington concluded that Mother's home would be an unstable and unsafe placement for Children. *Id*. at 187. He testified that, as of the date of the permanency fact-finding hearing, DCS was no closer to reuniting Children with Mother than it had been when FCM Washington joined the case in February 2014. *Id*. at 192-93. He testified that DCS did everything it could to reunite Children with Parents; however, it was now in Children's best interests to proceed with the termination of Parents' parental rights and pursue the permanency plan of being adopted by their foster mother. *Id*. at 193. On April 27, 2016, the juvenile court entered its order terminating Father's parental rights to R.Y. and T.Y. and Mother's parental rights to Children. Parents now appeal.

# Discussion and Decision

## I. Termination of Parental Rights

"The traditional right of parents to establish a home and raise their children is protected by the Fourteenth Amendment of the United States Constitution." *In re J.W., Jr.*, 27 N.E.3d 1185, 1187-88 (Ind. Ct. App. 2015), *trans. denied*. "However, a trial court must subordinate the interests of the parents to those of the child when evaluating the circumstances surrounding a termination." *Id.* at 1188. Termination of a parent-child relationship is proper where a child's emotional and physical development is threatened. *Id.* "Although the right to raise one's own child should not be terminated solely because there is a better home available for the child, parental rights may be terminated when a parent is unable or unwilling to meet his or her parental responsibilities." *Id.*

Before an involuntary termination of parental rights may occur, DCS is required to allege and prove, among other things:

> (B) that one (1) of the following is true:
>
> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
>
> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

(iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;

(C) that termination is in the best interests of the child; and

(D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2).[2] DCS's burden of proof for establishing these allegations in termination cases is one of clear and convincing evidence. *In re H.L.*, 915 N.E.2d 145, 149 (Ind. Ct. App. 2009). If the court finds that the allegations in a petition described in section 4 of this chapter are true, the court shall terminate the parent-child relationship. Ind. Code § 31-35-2-8(a).

[17] When reviewing a termination of parental rights issue, our court will not reweigh the evidence or judge the credibility of the witnesses. *In re R.S.*, 56 N.E.3d 625, 628 (Ind. 2016). We consider "only the evidence and any reasonable inferences therefrom that support the judgment," and give "'due regard' to the trial court's opportunity to judge the credibility of the witnesses firsthand." *K.T.K. v. Ind. Dep't of Child Servs.*, 989 N.E.2d 1225, 1229 (Ind. 2013). Here, in terminating Parents' parental rights to their respective children, the juvenile court entered specific findings and conclusions. When a trial court's judgment contains specific findings of fact and conclusions thereon, we

---

[2] Father and Mother concede that the juvenile court was correct in finding that Children were removed from Parents' care for at least six months under a dispositional decree, thus satisfying the element required under Indiana Code § 31-35-2-4(2)(A)(1). *Mother's Br.* at 9; *Father's App.* at 12-13.

apply a two-tiered standard of review. *In re R.S.*, 56 N.E.3d at 628 (citation omitted). First, we determine whether the evidence supports the findings, and second, we determine whether the findings support the judgment. *Id.* (citation omitted). We will set aside the court's judgment terminating a parent-child relationship only if it is clearly erroneous. *Id.* Findings are clearly erroneous only when the record contains no facts or inferences drawn therefrom that support them. *In re A.G.*, 6 N.E.3d 952, 957 (Ind. Ct. App. 2014). A judgment is clearly erroneous if the findings do not support the trial court's conclusions or the conclusions do not support the judgment. *Id.* If the evidence and inferences support the trial court's decision, we must affirm. *A.D.S. v. Ind. Dep't of Child Servs.*, 987 N.E.2d 1150, 1156 (Ind. Ct. App. 2013), *trans. denied*.

[18] In its April 27, 2016 order terminating Parents' parental rights, the juvenile court entered findings of fact and conclusions thereon. While Mother challenges four of the juvenile court's findings, as we discuss below, Father challenges none of the findings. An unchallenged finding is taken as true. *See McMaster v. McMaster*, 681 N.E.2d 744, 747 (Ind. Ct. App. 1997) (accepting as true trial court findings that appellant did not challenge). Children were removed from Mother's home on February 15, 2013 and have been under the supervision of DCS for at least fifteen of the most recent twenty-two months. *Mother's App.* at 1, paras. 1, 2.[3] The juvenile court found that Parents had been

---

[3] The juvenile court does not number its findings. For clarity, we have assigned numbers to each paragraph beginning with Paragraph 1 after the phrase, "The allegations of the petition are true," and ending with Paragraph 27 before the phrase, "Further the factors requiring dismissal . . . ." *Mother's App.* at 1-5.

previously involved with DCS in connection with an Informal Adjustment pertaining to T.Y. having been born testing positive for marijuana. The Informal Adjustment was open from June 2012 until December 2012.

## *A. Father*

[19] Although he does not contest any of the juvenile court's findings, Father argues that the termination of his parental rights was not supported by clear and convincing evidence. He contends that the juvenile court was clearly erroneous in concluding that: (1) there is a reasonable probability that: (a) the conditions that resulted in the removal of R.Y. and T.Y. or the reasons for placement outside Parents' home will not be remedied; and (b) the continuation of the parent-child relationship poses a threat to the well-being R.Y. and T.Y.; (2) termination was in the best interests of R.Y. and T.Y.; and (3) there was a satisfactory plan for the care and treatment of R.Y. and T.Y.

[20] In determining whether the conditions that resulted in the removal of R.Y. and T.Y. will likely not be remedied, we engage in a two-step analysis. *In re E.M.*, 4 N.E.3d 636, 642-43 (Ind. 2014). First, we identify the conditions that led to removal; and second, we determine whether there is a reasonable probability that those conditions will not be remedied. *Id*. at 643. "In the second step, the trial court must judge a parent's fitness as of the time of the termination proceeding, taking into consideration evidence of changed conditions," balancing a parent's recent improvements against "habitual pattern[s] of conduct to determine whether there is a substantial probability of future neglect or deprivation." *Bester v. Lake Cnty. Office of Family & Children*, 839 N.E.2d 143,

152 (Ind. 2005). "We entrust that delicate balance to the trial court, which has discretion to weigh a parent's prior history more heavily than efforts made only shortly before termination." *In re E.M.*, 4 N.E.3d at 643. "Requiring trial courts to give due regard to changed conditions does not preclude them from finding that parents' past behavior is the best predictor of their future behavior." *Id*.

[21]     Father, who was not present at the time DCS removed R.Y. and T.Y. from Mother's home, contends they were removed because Mother was drunk, and she left them unattended. *Father's Br*. at 7. While Father suggests that these are conditions he cannot remedy, Father fails to address the juvenile court's uncontested finding that Parents had a history of domestic violence and that R.Y. and T.Y. were placed outside the home because Mother was arrested and "[F]ather was unavailable." *Mother's App*. at 2, para. 3.[4]

[22]     The condition of Father's unavailability has not been remedied. Services were offered to Father, including clinical assessment, substance abuse evaluations, psychological and psychiatric evaluations, parenting education, individual therapy, and domestic violence services. *Id*. at 2, para. 5. The juvenile court found that Father was inconsistent with his services, was highly inconsistent with therapy services, and made no progress because he failed to make himself

---

[4] Father also suggests that DCS did not intend to reunite him with his children, *Father's Br*. at 5. We find no evidence to support that statement. Here, Father was provided numerous services and offered supervised visitation in an effort to reunite him with his children. Father's lack of involvement does not change the efforts DCS expended on Father's behalf.

available for services. *Id*. at 2, para. 7. Anger and abuse of alcohol were major factors that Father did not address. The juvenile court found credible Father's testimony that "he made the decision not to participate in any services for reunification and voluntarily stopped all services." *Id*. at 3, para. 11. Father was "totally non-compliant with services and services were stopped July of 2015." *Id*. "After three years of service, [Father is] no closer to reunification with [his] children than [he] was three years ago, when the children were removed." *Id*. at 5, para. 23. "Father voluntarily did not see his children for six months. Father was not vested in services, did not visit his children consistently, and has shown no interest in parenting these children." *Id*. at 3, para. 11. The juvenile court's conclusion that the reasons R.Y. and T.Y. were removed in February 2013 have not been remedied and are unlikely to be remedied in the near future is not clearly erroneous.[5] *Id*. at 5, para. 23.

[23] Father also asserts that there was insufficient evidence to support the juvenile court's conclusion that termination of the parent-child relationship was in the best interests of R.Y. and T.Y. Father contends that the juvenile court failed to address the pain and suffering R.Y. and T.Y. will feel when they realize that

---

[5] Father also contends that DCS failed to prove by clear and convincing evidence that there was a reasonable probability that the continuation of the parent-child relationship posed a threat to the well-being of R.Y. and T.Y. Indiana Code section 31-35-2-4(b)(2)(B) is written such that, to properly effectuate the termination of parental rights, the juvenile court need only find that one of the requirements of subsection (b)(2)(B) has been established by clear and convincing evidence. *A.D.S. v. Ind. Dep't of Child Servs*., 987 N.E.2d 1150, 1156 (Ind. Ct. App. 2013), *trans. denied*. Therefore, finding, as we do, that sufficient evidence supports the conclusion that the conditions resulting in the removal of R.Y. and T.Y. will likely not be remedied, we need not also address whether sufficient evidence supported the conclusion that the continuation of the parent-child relationship posed a threat to the well-being of those children.

they "will not have any further contact with their father or his family." *Father's Br.* at 14. Father also asserts that he is young, may have more children, and R.Y. and T.Y. "should have a fundamental right to have a relationship with their other siblings." *Id.* at 15. Father, however, cites to no authority to suggest how the above considerations impact a best-interests analysis. Generally, failure to make a cogent argument results in waiver of the issue. *See A.D.S.*, 987 N.E.2d at 1156 n.4 (arguments waived on appeal when mother failed to support them with cogent argument). However, considering the significance of terminating parental rights, here, we choose to address whether termination of Father's parental rights was in the best interests of R.Y. and T.Y.

[24] In determining what is in the best interests of a child, the juvenile court must look beyond the factors identified by DCS and consider the totality of the evidence. *A.D.S.*, 987 N.E.2d 1158. In so doing, the juvenile court must subordinate the interests of the parent to those of the child. *Id.* A court need not wait until the child is irreversibly harmed before terminating the parent-child relationship. *Id.* "Moreover, we have previously held that the recommendation by both the case manager and child advocate to terminate parental rights, in addition to evidence that the conditions resulting in removal will not be remedied, is sufficient to show by clear and convincing evidence that termination is in the child's best interests." *Id.* at 1158-59.

[25] Here, the domestic violence issues between Mother and Father were a concern throughout DCS's involvement. Father testified that he completed anger management counseling in 2013; however, the juvenile court found that

episodes of domestic violence between Parents occurred after that date. *Id.* at 3, paras. 10, 14. Father was totally non-compliant in services and did not contact DCS, nor could DCS find him, from about March 2014 until around December 2014. *Tr.* at 191. Additionally, Father chose not to participate in any services for reunification and voluntarily stopped all services. *Mother's App.* at 3, para. 11. During the three years preceding the termination, all three children were able to live together with the same foster mother—the mother who intends to adopt them. FCM Washington testified that, as of the date of the permanency fact-finding hearing, DCS was no closer to reuniting R.Y. and T.Y. with Father than it had been when FCM Washington joined the case in February 2014. *Id.* at 193. FCM Washington testified, and the juvenile court agreed, that DCS did everything it could to reunite R.Y. and T.Y. with Father; however, it was now in the best interests of R.Y. and T.Y. to proceed with the termination of Father's parental rights and pursue the permanency plan of being adopted by their foster mother.[6] *Tr.* at 193. The juvenile court did not err in concluding that termination of Father's parental rights was in his children's best interests.

[26] Finally, Father argues that DCS does not have a satisfactory plan for the care and treatment of R.Y. and T.Y. FCM Washington testified that he had conferred with Children's foster mother prior to the hearing and that she confirmed her interest in adopting Children. Father, however, noting that

---

[6] Although attorneys for the Court Appointed Special Advocate ("CASA") appeared at the evidentiary hearing, the CASA did not testify.

foster mother did not testify at the termination hearing regarding her intent to adopt Children, maintains that the DCS plan for the future care and custody of R.Y., T.C.Y., and T.Y. is "marginal at best." *Father's Br.* at 14. We disagree. Indiana courts have traditionally held that for a plan to be "satisfactory" for the purposes of the termination statute, it need not be detailed, so long as it offers a general sense of the direction in which the child will be going after the parent-child relationship is terminated. *In re A.S.*, 17 N.E.3d 994, 1007 (Ind. Ct. App. 2014), *trans. denied*. A DCS plan that attempts to find suitable parents to adopt the children is a satisfactory plan. *Id*. "In other words, there need not be a guarantee that a suitable adoption will take place, only that DCS will attempt to find a suitable adoptive parent." *Id*. Accordingly, a plan is not unsatisfactory just because DCS has not identified a specific family to adopt the children. *Id*. Here, DCS confirmed that the foster mother intended to adopt Children. The juvenile court did not err in concluding there was a satisfactory plan for the care and treatment of R.Y. and T.Y. DCS alleged and proved by clear and convincing evidence each element of Indiana Code section 31-35-2-4(b)(2). The juvenile court did not err in terminating Father's parental rights as to R.Y. and T.Y.

## B. Mother

[27] Mother challenges the juvenile court's findings of fact in Paragraphs 12, 13, 18, and 22.[7] Addressing Paragraph 12, Mother contends that the fact that she has two older children who do not live with her does not support the juvenile court's finding that "Mother does not have custody of any of her children." *Mother's Br.* at 5-6; *Mother's App.* at 3, para. 12. Here, the juvenile court was not concerned with determining who had legal custody of each of Mother's five children; instead, the court was concerned with whether any of those children were in Mother's home and under her care. Viewing the evidence in the light most favorable to the juvenile court's findings, as we must, we cannot say that it was error for the juvenile court to find that evidence that all of Mother's children lived outside her home equated to a finding that Mother did not have custody of any of her children. *See In re Termination of Parent-Child Relationship of D.D.*, 804 N.E.2d 258, 265 (Ind. Ct. App. 2004) (we consider only evidence and reasonable inferences most favorable to judgment), *trans. denied*.

[28] Mother also argues that, notwithstanding her five years of college, her cognitive defects prevented her from engaging in services; therefore, it was error for the juvenile court to find in Paragraph 13 that she "is an educated person," was not accepting of therapy, and "did not vest herself in the services." *Mother's Br.* at

---

[7] Mother also mentions that the evidence does not clearly and convincingly support Paragraph 24. *Mother's Br.* at 8. Because Mother fails to support her assertions with argument or citations to the record, her argument is waived. *See Ramsey v. Madison Cnty. Dep't of Family & Children*, 707 N.E.2d 814, 818 (Ind. Ct. App. 1999).

10-11; *Mother's App*. at 3, para. 13. Mother asserts that her requests for help from FCM Washington and her participation in group therapy undermine the juvenile court's finding in Paragraph 18 that she "did not become vested in the services and did not seem willing to remedy the reasons for the removal of the children." *Mother's Br*. at 11; *Mother's App*. at 4, para. 18. Finally, Mother admits that, while there is evidence that she did not answer her door or do services for the month of April 2015, those facts, alone, are insufficient to support the juvenile court's finding in regarding Paragraph 22 that she would not answer her door for her case manager or to allow the Children to visit. *Mother's App*. at 5, para. 22. We find Mother's arguments regarding Paragraphs 13, 18, and 22 are an invitation for us to reweigh the evidence and judge the credibility of witnesses, which we cannot do. *In re J.C.*, 994 N.E.2d 278, 288 (Ind. Ct. App. 2013). The trial court's findings in Paragraphs 12, 13, 18, and 22 are not clearly erroneous.

[29] Mother also challenges the juvenile court's conclusions that: (1) there is a reasonable probability that: (a) the conditions that resulted in the removal of Children or the reasons for placement outside Parents' home will not be remedied; and (b) the continuation of the parent-child relationship poses a threat to the well-being of Children; and (2) termination was in the best interests of Children.

[30] Children were removed from Mother's care when Parents were fighting and a refrigerator was knocked onto its side and after Mother had been drinking, left Children alone, and was arrested for public intoxication. Mother and Father

had a history of domestic violence. Mother contends that the evidence did not clearly and convincingly prove that conditions resulting in removal of Children likely will not be remedied. We disagree.

[31] The CHINS and termination proceedings extended over a period of three years. Mother was offered numerous services during that period of time, including clinical assessments, supervised visitation, psychiatric and psychological evaluations, substance abuse evaluations, and services to address domestic violence, anger management, and parenting education. *Mother's App*. at 2, para. 5. Therapist Parker testified that, although Mother initially made herself available for services, she did not participate during services, she was resistant to take prescribed drugs to stabilize her mood, and she denied she had a problem with alcohol. *Id*. at 3, para. 13. Mother continued her toxic relationship with Father even after obtaining a protective order against him. *Id*. at 3, para. 14. It was Mother's opinion that Children should never have been removed from her home and that she did not have anything "she needed to work on." *Tr*. at 29-30.

[32] Mother believes she has no problem with alcohol or drugs. *Mother's App*. at 4, para. 16. On appeal, Mother contends that her use of alcohol is not a habit, but directly related to DCS having removed Children from her home. Mother claims she was too busy to drink when Children were home and that she drinks now to feel better about Children being gone. *Mother's Br*. at 13. The evidence, however, does not support Mother's contention that she does not have a substance abuse issue. Mother's history of substance abuse predates DCS's

current involvement in Mother's life. Mother's youngest child tested positive for marijuana at birth resulting in an Informal Adjustment. Mother also testified that one or two of her arrests between 2008 and February 2013 were related to alcohol. *Tr.* at 109, 111. Mother was arrested for public intoxication on the night Children were removed. In February 2013, referring to Mother's prior use of alcohol, Father stated that Mother "became angry and violent when she was drinking." *Mother's App.* at 2, para. 8. Mother was not able to change this habitual behavior. Recognizing that Mother attended a group session to address substance abuse issues, Therapist Parker confirmed that Mother continued to have relapses, as reflected by subsequent legal charges related to Mother's use of alcohol. In fact, Mother even admitted to using marijuana on the day before the April 2016 evidentiary hearing. *Tr.* at 100. Therapist Parker opined that Mother "had plenty of time, plenty of opportunities, was able to meet with [Therapist Parker], but despite all of that we are kind of right where we started." *Id.* at 43. By the time therapy ended, Mother still had not admitted that she had a problem. *Id*. at 44. Based on this evidence, the juvenile court did not err in concluding that the conditions that resulted in the removal of Children from Mother will likely not be remedied.[8]

---

[8] Like Father, Mother also contends that DCS failed to prove by clear and convincing evidence that there was a reasonable probability that the continuation of the parent-child relationship posed a threat to the well-being of Children. DCS must prove only one of the requirements of Indiana Code section 31-35-2-4(b)(2)(B). *A.D.S.,* 987 N.E.2d at 1156. Finding sufficient evidence that conditions will likely not be remedied, we do not address the issue of threat.

[33] Mother also suggests that the findings do not support the juvenile court's conclusion that termination of the parent-child relationship was in the best interests of Children. Mother argues that, in the absence of testimony regarding Children's relationship with Mother and with the foster mother, there was insufficient evidence to conclude that termination of Mother's rights were in the best interests of Children. We disagree.

[34] A determination of the best interests of the children should be based on the totality of the circumstances." *In re A.P.*, 981 N.E.2d 75, 82 (Ind. Ct. App. 2012). Here, the domestic violence issues between Mother and Father were a concern throughout DCS's involvement. Mother continued her toxic relationship with Father even though she had obtained a protective order against him. *Mother's App.* at 3, para. 14. Mother did not engage during services and denied she had a problem with alcohol, yet continued to drink. *Id.* at 3, para. 13. FCM Washington testified that it was in the best interests of Children that Mother's parental rights be terminated. *Tr.* at 193.

[35] The juvenile court found:

> The reasons that the children were removed in February of 2013 have not been remedied by either parent and is [sic] unlikely to be remedied in any near future. After three years of services, the parents are no closer to reunification with their children than they were three years ago when the children were removed.
>
> Neither parent is providing any emotional or financial support for the children. Neither parent has completed any case plan for reunification. Neither parent can maintain sobriety and provide

a safe environment for children. The children have been in placement since February of 2013 and have never been returned to parental care or custody. The children are placed together in the home and are bonded and thriving.

*Mother's App.* at 5, paras. 23, 24.

[36] Mother recognizes that permanency is a central consideration in determining what will be in Children's best interest. *Mother's Br.* at 16. Children have been out of Mother's care and have lived together in the same foster home for three years, and the foster mother intends to adopt Children. The foster home is a place where Children are bonded and thriving. We find no error in the juvenile court's conclusion that termination of Mother's parental rights is in the best interests of Children. The State alleged and proved the elements of Indiana Code section 31-35-2-4(b)(2) by clear and convincing evidence, and the juvenile court did not err in terminating Mother's parental rights to Children.

## II. Effective Assistance of Counsel

[37] Mother asserts that she received ineffective assistance of counsel. The standard for such a review was set forth by our Supreme Court's in *Baker v. Marion County Office of Family & Children*, 810 N.E.2d 1035 (Ind. 2004) where our Supreme Court held:

> Where parents whose rights were terminated upon trial claim on appeal that their lawyer underperformed, we deem the focus of the inquiry to be whether it appears that the parents received a fundamentally fair trial whose facts demonstrate an accurate determination. The question is not whether the lawyer might

have objected to this or that, but whether the lawyer's overall performance was so defective that the appellate court cannot say with confidence that the conditions leading to the removal of the children from parental care are unlikely to be remedied and that termination is in the child's best interest.

*Baker*, 810 N.E.2d at 1041. Mother contends that her trial counsel was ineffective for failing to: (1) object to questions about her criminal history; (2) object to the admission of Mother's July 2012 police report, *State's Exhibit* AA; (3) elicit testimony about Mother's cognitive delays; and (4) elicit testimony about her relationship with Children. *Mother's Br*. at 18.

[38] Regarding the failure of Mother's counsel to object to evidence about Mother's criminal history, items (1) and (2) above, any objection trial counsel could have made would have been properly overruled by the juvenile court. A determination of a parent's fitness to care for his or her child requires an evaluation of a parent's habitual pattern of behavior as evidence of possible future neglect or deprivation. *Bester*, 839 N.E.2d at 152. In addressing this inquiry, courts may consider factors including a parent's prior criminal history, drug and alcohol abuse, lack of employment, and failure to provide support. *A.B. v. Ind. Dep't of Child Servs*., 61 N.E.3d 1182, 1189 (Ind. Ct. App. 2016). Trial counsel was not ineffective for failing to object to the admission of evidence pertaining to Mother's criminal history.

[39] Mother also contends that trial counsel was ineffective for failing to investigate Mother's alleged cognitive delay. It is not clear how further investigation would have aided Mother's cause. Therapist Parker's testimony on the subject

was strong, suggesting, as she did, that Mother may suffer cognitive deficits that could have prevented her from understanding information provided to her during therapy. *Tr.* at 30-32. This testimony alone could have allowed the juvenile court to conclude that Mother needed more time to pursue services for reunification. However, further inquiry into this subject could have provided additional support for the juvenile court's conclusion that conditions resulting in Children's removal from Mother's care would not be remedied. On this issue, we again find no ineffective assistance of counsel.

[40] Finally, Mother argues that trial counsel was ineffective for failing to elicit testimony about her relationship with Children. Children were removed from Mother's care when they were four years, two years, and nine months of age and, during the ensuing three years were not returned to Mother's care. *Mother's App.* at 5, para. 24. Mother was inconsistent in her visits with Children, and all visitation was terminated in July 2015. *State's Ex.* Y at 2. By Mother's own admission, she continued to drink alcohol after Children were removed as a way to "socialize and make [her]self happy."[9] *Tr.* at 93. Under these conditions, it is unclear how Children could have had a strong relationship with their Mother. However, assuming, arguendo, that they did, the reasons for terminating Mother's parental rights Children still would have outweighed any such relationship.

---

[9] When asked during the fact-finding hearing whether Mother has "more time to drink and get in trouble now," Mother responded, "No, I'm saying I have more time to socialize." *Tr.* at 100.

[41] Here, we can say with confidence that the conditions leading to Children's removal or the reasons for placement outside the home of Mother are unlikely to be remedied and that termination of Mother's parental rights is in the Children's best interests. Mother's trial counsel was not ineffective, and she received a fundamentally fair trial, the facts of which demonstrate an accurate determination. *Baker*, 810 N.E.2d at 1041.

[42] Finding no error on the part of the juvenile court or Mother's trial counsel, we affirm the juvenile court's decision to terminate Father's parental rights to R.Y. and T.Y. and to terminate Mother's parental rights to Children.

[43] Affirmed.

May, J., and Crone, J., concur.