

FILED

Sep 26 2016, 9:40 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANTS

Michael B. Troemel
Lafayette, Indiana

Braden J. Dean
Logansport, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Robert J. Henke
Deputy Attorney General

James D. Boyer
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| A.B. & T.B., <br> *Appellants-Defendants,* <br><br> v. <br><br> The Indiana Department of Child Services, <br> *Appellee-Plaintiff.* | September 26, 2016 <br><br> Court of Appeals Case No. 79A05-1602-JT-354 <br><br> Appeal from the Tippecanoe Superior Court <br><br> The Honorable Faith A. Graham, Judge <br><br> The Honorable Thomas K. Milligan, Special Judge <br><br> Trial Court Cause No. 79D03-1506-JT-46, 79D03-1506-JT-47 |

**Altice, Judge.**

**Case Summary**

[1] This appeal involves the involuntary termination of parental rights with respect to two children, T.B. and R.K., who are half-siblings. Mother and Father are the parents of T.B., and R.K.'s father is deceased. Mother has been incarcerated throughout the underlying CHINS and termination proceedings. Father engaged in services for several months until his overwhelming distrust and dislike for the Indiana Department of Child Services (DCS) and service providers took over. From that point on, Father angrily rebuffed any attempts by providers to reengage him in services and ceased visiting with the children.

[2] On appeal, Father presents a purely procedural issue. He contends that his parental rights with respect to T.B. were terminated without due process of law because the trial court terminated Father's telephonic participation during the final hearing due to Father's angry outbursts. Mother, on the other hand, challenges the trial court's findings and conclusions supporting the termination.

[3] We affirm.

## Facts & Procedural History

[4] T.B. was born to Mother and Father on July 2, 2009. When T.B. was six months old, Mother obtained a protective order against Father. Thereafter, on January 11, 2011, Mother gave birth to R.K., whose father passed away the following year.

[5] Mother has a lengthy history of criminal convictions and drug abuse. Unfortunately, this pattern continued after the birth of her children. On August

6, 2012, Mother was arrested and charged with Class B felony dealing in methamphetamine and Class D felony possession of precursors. She bonded out of jail shortly thereafter. Within six months of being out on bond, two active methamphetamine labs were found in the home she shared with her children. Mother was charged with Class B felony dealing methamphetamine, Class D felony possession of methamphetamine, and Class C felony neglect of a dependent. She pled guilty as charged and, on June 11, 2013, was sentenced to a total of fifteen years – ten executed and five suspended to probation. With respect to the August 2012 charges, Mother pled guilty to the Class D felony and was sentenced to two years in prison to be served consecutively to the other sentence. Mother has been incarcerated since February 4, 2013, and has not seen her children since.

[6] Shortly after Mother's incarceration in February 2013, T.B. and R.K. were placed in Father's care. His two older children H.B. (then age eleven) and C.B. (then age ten) were placed in his care by their mother in the summer of 2013.

[7] Father reached out to DCS in March or April of 2014 because he was overwhelmed parenting the four children and struggling to provide a safe and stable home. He was unable to control the two older children, who were involved in truancy mediation services at the time. Father also reported that he was receiving food stamps, had no money for bus fare, and was behind in rent.

[8] DCS initially attempted to create a plan with Father to provide services through a program of informal adjustment, but Father refused. DCS then filed a

CHINS petition regarding the four children on April 16, 2014. Following a detention hearing on May 9, 2014, the children were allowed to remain in Father's care so long as a safety plan was developed and Father did not allow anyone to care for the children until approved by DCS.

[9] On May 26, 2014, law enforcement executed a well-child check at Father's home. Father was not at home and had left the two older children in charge. R.K. was observed with injuries to his feet. The injuries had occurred about a week earlier when C.B. was left to supervise and he placed the three-year-old child into a scalding hot bath. R.K. sustained second degree burns to his feet, yet Father failed to seek medical attention or disclose the injuries to DCS. Upon discovering the injuries, R.K. was immediately taken to the emergency room and then transported by ambulance to Riley Children's Hospital for treatment. As a result, all of the children were removed from Father's home. R.K. and T.B. were eventually placed together in foster care, and the older children were placed with their maternal grandparents.

[10] Following a fact-finding hearing on June 9, 2014, the children were adjudicated CHINS. The trial court issued a dispositional order and a detailed parental participation decree after the dispositional hearing on July 2, 2014. Father was ordered, among other things, to participate in visitation, Fatherhood Engagement, and individual therapy. He was also ordered to stay in contact with DCS, notify DCS of changes in his address or employment, and maintain safe housing. Mother, due to her continued incarceration, was ordered to

maintain contact with DCS and participate in services offered during incarceration and provide certificates of completion to DCS.

[11] Father initially cooperated to some degree with service providers. Supervised visitation went well, and Father appeared able to care and provide for the children. Relatively quickly, however, Father let his distrust of and anger toward DCS take over. He rejected parenting advice from service providers and refused to abide by the visitation rules. Despite warnings, Father repeatedly discussed the case with the children during visits and criticized or made negative comments about DCS, the CASA, and/or the foster parents. At times, Father would explode in anger when redirected by visitation supervisors.

[12] Eventually any interaction Father had with service providers, even in court, ultimately led to him badmouthing DCS, the system, the foster parents, and/or the CASA. Father also left profanity-filled, threatening voicemail messages for the Family Case Manager (FCM). Father did not like that T.B. and R.K. were in foster care and wanted them to be placed with relatives even when there were no suitable relatives available. By March 2015, Father "overtly refused to participate in services." *Transcript* at 143. He was later evicted from his home and, thereafter, refused to provide his new address to the court or DCS.

[13] Although Mother was cooperative with DCS, there were limited services available to her due to her incarceration, and she was unable to visit with T.B. and R.K. Mother testified that she completed several programs in prison, but she did not provide certificates of completion to DCS. Service providers also

questioned whether she had obtained appropriate substance abuse and mental health therapy.

On June 8, 2015, the trial court entered an order changing the permanency plan to concurrent plans of reunification, guardianship, and termination of parental rights. The following day, DCS filed termination petitions with respect to all four children. The final hearing was held on August 31 and November 6, 2015. At the onset of the second day of the final hearing, DCS dismissed the termination petitions with respect to C.B. and H.B.[1] Accordingly, the termination hearing proceeded with regard to T.B. and R.K., then ages six and four respectively. On February 4, 2016, the trial court entered its order terminating Mother's parental rights to T.B. and R.K. and Father's parental rights to T.B. Mother and Father now appeal. Additional facts will be provided below as needed.

## Discussion & Decision

### 1. Father's Due Process Claim

Father raises a purely procedural issue on appeal. He claims that the trial court deprived him of due process when it terminated his telephonic participation during the second day of the termination hearing. Father asserts that this

---

[1] The parties had reached an agreement. The maternal grandparents were to become C.B.'s legal guardians. H.B., on the other hand, was then in psychiatric placement and DCS indicated that because it did not have a viable, long-term plan for her care and treatment, it would not be in her best interest to proceed with termination.

denied him of "the opportunity to not only submit evidence but to present any opposition at all." *Father's Appellant's Brief* at 9.

[16]   During the two days of the termination hearing, Father was represented by counsel. Although he lived locally, Father obtained permission from the trial court to appear telephonically at the hearing. Father proceeded to take advantage of the trial court's leniency in this regard. On the first day of the hearing, Father interrupted the trial court, the attorneys, and the witnesses on numerous occasions. The court warned Father that if he continued, he would be hung up on. Despite this warning, Father persisted. At the conclusion of the first day of the hearing, when Father again sought to interject, the trial court expressly directed Father to work through his attorney.

[17]   On the second and final day of the hearing, Father continued his disruptive behavior over the telephone. At one point Father interrupted the proceedings to call the DCS liars and threaten, with regard to his vile voicemail messages, "you're going to get plenty more, I'm not done with you yet." *Transcript* at 72. The trial court warned, "[Father], this is Judge Milligan, one more outburst like that and I'm going to hang up on you. You're not going to participate in this proceeding if you continue to talk like that and if you continue to interrupt other people." *Id*. Father indicated that he understood, and he behaved himself during the testimony of the next witness.

[18]   Father was then called as a witness by DCS. Shortly into his testimony, Father referred to DCS as "terrorists" and stated "you people are sneaky". *Id*. at 104.

The trial court eventually cautioned him to "just answer" the questions being asked. *Id*. at 106. After a few more questions and general unresponsiveness from Father, the following colloquy occurred between Father and DCS's counsel:

Q. Do you have a good clue of how long it's been since you've seen your children?

A. Oh man it's been like a damn year ago.

Q. Okay.

A. When was the last time you seen your kids?

Q. I apologize sir but I'm not supposed to answer, only to ask questions. Have you been participating with – when is the last time you participated in Fatherhood Engagement, do you know approximately how long?

A. No I have no clue, because I'm in a state of rage, I cannot remember those dates, so I'm sorry.

Q. Have you stayed in regular contact with [DCS]?

A. No I refuse to, because you're liars.

Q. When you say refuse to don't you in fact call the DCS case manager fairly regularly?

A.  I'm not telling anybody…yes I contact you and send you emails of hatred about how I'm going to kick your f*cking a** when I get you out on the street.

Q.  Okay well I was asking about - -

A.  You don't give a sh*t - -

Q.  I was asking about the case manager sir, not about myself. Do you communicate regularly with [the FCM]?

A.  No I do no communicate, I leave messages of hatred and how I want to mash your f*cking face in with my foot - -

*Id*. at 107-08.  The trial court then quickly put an end to Father's rant by disconnecting the telephone line as previously warned.

[19]    In response to an objection lodged by Father's counsel, DCS proposed that Father be allowed to participate in person.  The court responded:

No.  And I respect the due process, I respect the ability and the right of a person to be in court and participate, but the Court's no longer going to allow the disruption that's happening.  And the disrespect to the Court, to Counsel, to the parties.  And so the objection is overruled.

*Id*. at 110.  After a brief recess, Father's counsel indicated that he met with Father just outside the courthouse to discuss the possibility of appearing in person.  Father rejected the idea.

[20] Counsel continued to represent Father throughout the hearing. After the testimony of three witnesses, the hearing was recessed for lunch. Counsel spoke with Father during this time. When the hearing reconvened, counsel informed the court that Father had "cooled down" and would like "permission to present his case by telephone". *Id.* at 207. The court denied the request but indicated that it would permit Father to appear in person. Counsel relayed this information to Father, who again refused to appear in person. As a result, Father was unable to present testimony in his case in chief.

[21] As set forth above, Father argues that he was deprived of due process when the court terminated his telephonic participation on the second day of the hearing. On the contrary, the court initially extended Father a courtesy by allowing him – a local litigant – to appear telephonically rather than in person. The court aptly withdrew this privilege upon Father's relentless abuse of it. *See Vaughn v. State*, 971 N.E.2d 63, 70 (Ind. 2012) ("a trial court judge also has the responsibility of managing the proceedings so proper order exists in the courtroom"); *Stellwag v. State*, 854 N.E.2d 64, 68 (Ind. Ct. App. 2006) ("A trial judge must be given latitude to run the courtroom and maintain discipline and control of the trial."). Father asserts that this resulted in an inability to present his case. The record, however, establishes that the court indicated it would permit Father to testify in person. Father inexplicably rejected this offer and, thus, chose not to testify.

[22] The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner. *See In re C.G.*, 954 N.E.2d 910,

917 (Ind. 2011). It is evident that Father was given this opportunity. His ultimate absence from the hearing was the result of his own disruptive actions and his decision not to appear in person despite a clear ability to do so. The trial court did nothing to deny Father due process.

## 2. Mother's Sufficiency Claim

[23] Mother's appeal focuses on the sufficiency of the evidence presented by DCS. When reviewing the termination of parental rights, we will not reweigh the evidence or judge the credibility of the witnesses. *In re D.D.,* 804 N.E.2d 258, 265 (Ind. Ct. App. 2004), *trans. denied.* Instead, we consider only the evidence and reasonable inferences most favorable to the judgment. *Id.* In deference to the trial court's unique position to assess the evidence, we will set aside its judgment terminating a parent-child relationship only if it is clearly erroneous. *In re L.S.,* 717 N.E.2d 204, 208 (Ind. Ct. App. 1999), *trans. denied.* Thus, if the evidence and inferences support the decision, we must affirm. *Id.*

[24] The trial court entered findings in its order terminating parental rights. When the trial court enters specific findings of fact and conclusions thereon, we apply a two-tiered standard of review. *Bester v. Lake Cnty. Office of Family & Children*, 839 N.E.2d 143, 147 (Ind. 2005). First, we determine whether the evidence supports the findings, and second we determine whether the findings support the judgment. *Id.* "Findings are clearly erroneous only when the record contains no facts to support them either directly or by inference." *Quillen v. Quillen*, 671 N.E.2d 98, 102 (Ind. 1996). A judgment is clearly erroneous only if

the findings do not support the court's conclusions or the conclusions do not support the judgment thereon. *Id.*

[25] The traditional right of parents to establish a home and raise their children is protected by the Fourteenth Amendment of the United States Constitution. *In re G.Y.*, 904 N.E.2d 1257, 1259 (Ind. 2009). The law provides for the termination of these rights when parents are unable or unwilling to meet their parental responsibilities. *In re R.H.,* 892 N.E.2d 144, 149 (Ind. Ct. App. 2008). In addition, a court must subordinate the interests of the parents to those of the child when evaluating the circumstances surrounding the termination. *In re K.S.,* 750 N.E.2d 832, 836 (Ind. Ct. App. 2001). The purpose of terminating parental rights is not to punish parents, but to protect their children. *Id*.

[26] When DCS seeks to involuntarily terminate a parent's parental rights, it must allege and prove by clear and convincing evidence:

> (B) that one (1) of the following is true:
>
>> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
>>
>> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>>
>> (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services[.]

Ind. Code § 31-35-2-4(b)(2)(B). Among other things, DCS must also prove by clear and convincing evidence that termination is in the best interests of the child. I.C. § 31-35-2-4(b)(2)(C).

[27] Mother first challenges the trial court's finding that I.C. § 31-35-2-4(b)(2)(B)(i) had been satisfied—i.e., that DCS had established by clear and convincing evidence a reasonable probability that the conditions resulting in T.B. and R.K.'s removal and placement outside her care will not be remedied. She argues that the reason for removal will be remedied once she is released from prison "somewhere between seven and nineteen months from the date of the TPR trial." *Mother's Appellant's Brief* at 5.

[28] In making a determination in this regard, the trial court must judge a parent's fitness to care for her children at the time of the termination hearing, taking into consideration evidence of changed conditions. *In re J.T.*, 742 N.E.2d 509, 512 (Ind. Ct. App. 2001), *trans. denied*. The court must also evaluate the parent's habitual patterns of conduct to determine whether there is a substantial probability of future neglect or deprivation of the child. *Id.* In conducting this inquiry, courts may consider evidence of a parent's prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate housing and employment. *A.F. v. Marion Cnty. Office of Family & Children*, 762 N.E.2d 1244, 1251 (Ind. Ct. App. 2002), *trans. denied*.

[29] It is not at all clear that Mother's release date was imminent at the time of the termination hearing, which concluded in November 2015. Mother testified that

her projected release date was June 2017 – nineteen months later – but could be as early as June 2016 *if* she earned all of the time cuts she was "working on." *Transcript* at 82. At the final hearing, however, the record indicates that the DOC website reflected a projected release date in July 2018 – almost three years after the hearing.

[30] In addition to ambiguity regarding Mother's release date, the record establishes that she will be on probation for five years following her release. Mother does not have a good track record on probation, having violated multiple times in the past. More importantly, we observe that her extensive criminal history spans her adult life, both pre- and post-motherhood.[2] *Cf. In re G.Y.*, 904 N.E.2d at 1262 ("all of Mother's criminal history consists of offenses that were committed before G.Y.'s conception….After that time and for the first 20 months of his

---

[2] The trial court detailed that history in its order:

> In June of 2001 in Madison County Mother was charged with and later plead [sic] guilty to Child Exploitation, Vicarious Sexual Gratification, and Sexual misconduct with a Minor; Mother was to serve nine (9) months in the [DOC] with twenty-seven (27) Months suspended. In June of 2005 in Cass County Mother was charged with and later plead [sic] guilty to Theft. Mother received a suspended sentence, violated her probation and was required to execute her suspended time. In August of 2005 in Madison County, Mother was charged with and later entered a guilty plea to Battery Bodily Injury [sic] and received a suspended sentence and violated her probation. In January of 2006 Mother was charged with and later plead [sic] guilty to Battery on a Police Officer and received a suspended sentence of 365 days incarceration and violated her probation. In September of 2005 Mother was charged with and later plead [sic] guilty to Public Intoxication and served fifteen (15) days in jail on a probation violation. In July of 2007 in Cass County, Mother was charged with and later plead [sic] guilty to Possession of Cocaine or Narcotic Drug, Possession of Paraphernalia and was sentenced to 1.5 years incarceration. In August of 2012 Mother was charged with Dealing Meth-Manufacture; Possession of Reagents/precursors with Intent to Manufacture a Controlled Substance. Mother entered a guilty plea to [the possession charge] and was sentenced to two (2) years in the [DOC]. In February of 2013 Mother was charged with Dealing Methamphetamine, Possession of Methamphetamine and Neglect of a Dependent. Mother entered guilty plea as to all three (3) counts and was sentenced to [an aggregate term of fifteen years].

*Appendix* at 15.

life, the record gives no indication that Mother was anything but a fit parent"). Mother committed her most serious crimes after giving birth to her children, and she placed them in danger by raising them in a home with active meth labs.

[31] Mother claims that she has made strides in prison and engaged in services. The trial court found in this regard that Mother "has not participated in any programs in the [DOC] which the Court finds would be useful and helpful and appropriate to her in assisting her in providing a safe, suitable home for the children." *Appendix* at 15. At first blush this finding appears heavy handed, as the evidence indicated that Mother did complete some services while incarcerated. Precisely what services, however, is not clear. Mother testified to a laundry list of services she had completed (i.e., a problem solving course, GED, a building trades program, anger management classes, and a substance abuse course), but she failed to provide certificates of completion for any of these. The CASA questioned whether Mother had completed "the right services that will prevent her from doing it again when she gets out, what caused her to be incarcerated in the first place." *Transcript* at 262. Further, the FCM testified that there was no indication that Mother had completed individual therapy to address her substance-abuse and mental-health issues.[3]

---

[3] Mother acknowledged this and indicated that the Mom's Against Meth course that she took was "a peer community resource course" that had no doctor or certified licensed therapist in charge and provided no aftercare. *Transcript* at 297.

[32] Even if the finding that Mother failed to participate in any programs that would assist in providing a safe, suitable home for the children was erroneous, in light of Mother's history of substance abuse, criminal convictions, continued incarceration, and lack of individual therapy, we conclude that the error was not so serious that it affected the trial court's ultimate decision. *See In re A.C.B.*, 598 N.E.2d 570, 573 (Ind. Ct. App. 1992) (affirming the termination of parental rights despite an erroneous finding because the error was "not of such magnitude that it calls into question the court's conclusion").

[33] We do not doubt that Mother has a strong desire to raise her children. In this vein, she cooperated with DCS and attempted to better herself while in prison. But she has been in prison for the majority of T.B. and R.K.'s lives and will continue to be for some time. Moreover, she has yet to adequately address her substance-abuse issues, which appear to be at the root of her criminal behavior. In light of Mother's extensive criminal history, including past violations of probation and bond, it is evident that Mother will have an uphill battle upon her release from prison.

[34] The record amply supports the trial court's conclusion that "Mother is in no position to care for the children and it is beyond reason for the children to have to wait for Mother to demonstrate an ability or willingness to meet their needs." *Appendix* at 17. Accordingly, the court's conclusion that there is a reasonable probability that the conditions resulting in T.B. and R.K.'s removal and continued placement outside Mother's care will not be remedied is not clearly erroneous.

[35] Mother also makes a brief argument regarding the best interests of the children. Essentially, she argues that there is a benefit to the children of giving her "one more chance" since her sentence is "almost served." *Mother's Appellant's Brief* at 11. As discussed above, however, the evidence does not support her claim that she is almost done serving her twelve-year sentence. At the time of the final hearing, Mother had been incarcerated and had not seen her children for nearly three years and it could be another two to three years before she is released to probation.

[36] Both the CASA and the FCM discussed the need for permanency and stability and testified that termination of Mother's parental rights is in the best interests of the children. *See In re J.S.*, 906 N.E.2d 226, 236 (Ind. Ct. App. 2009) ("the recommendations of the case manager and court-appointed advocate to terminate parental rights, in addition to evidence that the conditions resulting in removal will not be remedied, is sufficient to show by clear and convincing evidence that termination is in the child's best interests"). DCS sufficiently established that termination was in T.B. and R.K.'s best interests.

[37] Judgment affirmed.

[38] Bradford, J. and Pyle, J., concur.