# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Jul 08 2019, 10:03 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Suzy St. John
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Abigail R. Recker
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In the Matter of the Involuntary Termination of the Parent-Child Relationship of: | July 8, 2019 |
| | Court of Appeals Case No. 19A-JT-19 |
| D.S. (Minor Child) and K.W. (Mother), | |
| *Appellant-Respondent,* | Appeal from the Marion Superior Court Juvenile Division |
| v. | The Honorable Marilyn Moores, Judge |
| Indiana Department of Child Services, | The Honorable Larry Bradley, Magistrate |
| *Appellee-Petitioner,* | Trial Court Cause No. 49D09-1806-JT-731 |
| and | |

Child Advocates, Inc.,

*Guardian Ad Litem.*

**Altice, Judge.**

## Case Summary

K.W. (Mother) appeals the involuntary termination of her parental rights to her son, D.S. (Child). Mother presents two issues for our review, which we restate as:

1.  Did the trial court abuse its discretion in not allowing the admission of Mother's proffered exhibits?

2.  Is the evidence sufficient to support the termination of Mother's parental rights?

We affirm.

## Facts & Procedural History

Mother has three children, Child (born June 10, 2016) and his two half-sisters, B.W. (born September 4, 2013) and A.W. (born November 11, 2014)

(collectively, the Children).[1] On August 4, 2016, the Children were removed from Mother's care[2] due to allegations of neglect and substance abuse.[3] On August 8, 2016, DCS filed a Child in Need of Services (CHINS) petition alleging that Mother failed to provide a home that was free from substance abuse and that when the Children were observed they "had on dirty clothing, had soiled diapers, had unkempt hair, and appeared to be hungry."[4] *Exhibits* at 22. Mother subsequently admitted to the allegations in the CHINS petition. The court took Mother's admission under advisement until paternity could be established.

[4] Initially, the Children were placed with their maternal aunt and uncle. Approximately a month later, the Children were removed due to safety concerns and placed with another maternal aunt. In October 2016, placement changed again because the aunt's boyfriend no longer wanted the Children in the home. Thereafter, B.W. and A.W. were placed together in a foster home. Child, who was then four months old, was placed in a separate, pre-adoptive foster home where he has remained. When first placed in the foster home, Child was "withdrawn" and "[s]lept non-stop." *Transcript Vol. II* at 13. He did

---

[1] B.W. and A.W. share the same father. They are not part of this appeal.

[2] The events that led to intervention by the Department of Child Services (DCS) are not clear from the record.

[3] Mother initially denied any drug use, but she tested positive for methamphetamine, amphetamine, and marijuana.

[4] It was later revealed that Child's father had sexually molested B.W. and A.W. and that Mother knew of the molestation.

not have an interest in eating and did not interact appropriately for his age. Child's behaviors improved within a week to ten days of being placed in the foster home.

[5] On April 3, 2017, the court held a factfinding hearing and adjudicated Child a CHINS. On May 1, 2017, the court entered its dispositional decree and parental participation order requiring Mother to complete home-based therapy, home-based case management, a parenting assessment and follow all recommendations, and a psychological evaluation and follow all recommendations.

[6] Since the commencement of the CHINS proceedings, Mother has remained clean from drugs, and DCS no longer has concerns related to substance abuse. Mother also completed the court-ordered services and regularly visited Child. Despite the fact that Mother engaged in the services to reunite her with Child, DCS remained concerned that Mother is unable to successfully parent Child and meet his needs without the assistance of service providers. Thus, on March 5, 2018, DCS requested that the permanency plan for Child be changed to adoption. On July 9, 2018, DCS filed its petition to terminate Mother's parental rights. A factfinding hearing was held on November 27, 2018.

[7] At the hearing, the court heard from several service providers. Octavia Lee, who was assigned as Mother's family case manager (FCM) in July 2018, testified that she had reviewed Mother's file. FCM Lee explained that Mother had not remedied certain conditions giving rise to the CHINS as shown by the

fact that after numerous referrals Mother had not made any progress in terms of her ability to parent Child. FCM Lee noted that Mother continues to struggle with parenting Child even after the Children were separated for visitation purposes so Mother would visit with only one child at a time. She explained her concern for Child's safety:

> If [Child] was returned to [Mother]'s care, I would be concerned that his needs would not be meet [sic] due to DCS not being involved with the service providers and the reminders and the prompts needed to meet his needs as he continues to grow and get older. . . . [I]t's not a safe environment for [C]hild to return to.

*Id*. at 82. FCM Lee did not believe that Mother should be given additional time considering that she had shown no progress in two years and that Child needed permanency. She believed that termination of Mother's parental rights was in Child's best interests.

[8] Tenea Robinson, a visitation supervisor with Miracle Works, supervised Mother's visits with the Children from May 2017 through May 2018. Initially, Mother visited the Children two to three times a week and eventually, her visits were increased to every day, Monday through Friday. With the increased visitation, Child began exhibiting behaviors that were out of the norm, including biting, hitting, kicking, and throwing things. Child's foster mother testified that Child "was coming home from those visits just almost . . . inconsolable and he didn't want to sit down for dinner. He was just a different kid during that time." *Id*. at 17. Mother's visits were reduced, after which

Child's foster mother noted that Child "was just back to his old sweet self" at home and at daycare. *Id.*

[9] Over the course of a year, Robinson worked with Mother on setting parenting goals, including feeding the Children appropriate meals, being able to control unruly behaviors displayed by the Children, and giving the Children boundaries and having them respect those boundaries. Robinson also tried to help Mother with understanding when and how to discipline the Children. Despite her efforts, Mother continued to struggle with parenting, controlling the Children, and meeting their needs without repeated reminders and redirection during her visits. Robinson was concerned about Mother's lack of supervision of Child, who aged from an infant to a young toddler, when she was interacting with B.W. and A.W. during the visits when all of the Children were present.

[10] Robinson eventually created a chart as a visual aid for Mother to remind her of the things she needed to do to parent the Children during her visits with them. Robinson believed the chart was necessary because Mother "wasn't fully grasping the concept of parenting [the Children] correctly" and that it might help Mother "do things more independently." *Id*. at 41. Most of what they worked on "came down to safety and discipline." *Id*. at 48.

[11] From around October 5 through November 17, 2017, Mother was permitted to have unsupervised visits. During one visit, Robinson stopped in and was concerned whether the Children had eaten. Mother could not remember if she fed them, but then said she fed them breadsticks. During another visit

Robinson noted that there was an unidentified man present. Robinson was concerned because around this same time allegations of inappropriate touching by B.W. and A.W. started coming up again. During a third visit, Robinson observed people in Mother's home as she walked to the door, but she did not see the individuals after Mother let her inside the home because Mother "hid them in her bedroom . . . to make it seem like no one was there." *Id*. at 43. Mother knew that no one was supposed to be present during her unsupervised visits. When other people were present, Robinson found it necessary to stay for the remainder of the visit.

[12] Robinson testified that at times, Mother displayed the ability to parent the Children on her own, but that she would then regress. Overall, Robinson characterized Mother's progress as "back and forth" and opined that if Mother were given additional time, it would "continue to be a back and forth process." *Id*. at 44.

[13] In August 2018, Stacy Batts, a visitation facilitator and homemaker parent aide with Aspiring Transformations, began working with Mother a couple times a week. Initially, they set parenting and structure goals to strengthen the parenting bond between Mother and Child. Batts noted that Mother and Child had bonded and that Child was always excited to see her. Of concern to Batts was that Mother engaged in a permissive style of parenting, meaning that she allowed the Children to manage her and manage themselves, despite their young ages. She observed that B.W. and A.W. hit and kick Mother and that they would put their hands down their pants. During one specific incident,

A.W. sat on Mother's lap and fondled Mother's breast. Batts had to address the behavior and explain to the girls the difference between a good touch and a bad touch.

[14] Batts also noted that while being observed, Mother tended to model parenting techniques they had worked on, but that if Mother did not think she was being watched, she would resort to her permissive parenting style. Batts testified that "[a] lot of times" children who are parented in this way "dominate[] the relationship" and "struggle with trust of the parents" because they lack a sense of stability. *Id*. at 27. Although Mother arrived to her visits prepared with adequate food and appropriate toys and interacted with Child, Batts believed that Mother had made no progress in terms of her ability to parent Child. Batts stated, "it would concern me to have her by herself with her kids." *Id*. at 35.

[15] Batts testified that she had safety concerns if Child were placed in Mother's care because Mother continued to struggle "in making appropriate parenting choices." *Id.* at 29-30. She opined that "without a watchful eye over [Mother], we would see her in the system again." *Id*. at 28. When questioned about statements in her "report" that she had no safety concerns, Batts explained that she had no safety concerns given the controlled setting of the visit. *Id*. at 35. Batts never recommended that Mother's visits with Child be unsupervised.

[16] Guardian ad Litem (GAL) Jennifer Ankney was assigned to Mother at the start of the CHINS proceedings and has served in that capacity throughout the termination proceedings. GAL Ankney observed visits between Mother and

the Children and characterized them as "chaotic". *Id*. at 61. In her opinion Child's well-being would be threatened if he were returned to Mother's care because Mother lacks "the simplest of natural instincts of … being a parent". *Id*. at 73-74. She noted that Mother "seems to lack the ability to maintain or retain parenting education that . . . she's been provided. It's very difficult for her to parent all three children at the same time." *Id*. at 63. She was concerned that Mother had made no progress in her ability to parent over the course of two years and that as Child gets older, Mother will not know how to handle a situation without "constant one on one prompting and redirection" provided by service providers. *Id*. at 67. Given that the case has been ongoing for over two years, GAL Ankney testified that termination of Mother's parental rights was in Child's best interests so that he would not continue to "languish . . . while we're trying to see . . . if [Mother] can move forward." *Id*. at 70.

[17] Michell Walkey-Thornburgh is a therapist for B.W. and A.W. and had the opportunity to observe a visit between Mother and the Children in July 2018. She characterized the visit as "chaos," with the Children running around, hitting each other, kicking Mother, and being disrespectful. *Id*. at 55. She observed B.W. lashing out at Mother and saw Child repeatedly hitting A.W. in the face. She noted that Mother was unable to control the situation and that it created "a very unsafe environment." *Id*. at 55. At the time of the termination hearing, Mother was having visits with each child individually due to her inability to control them and the situation when they were together.

[18] Mother testified that she suffers from a mild intellectual disability caused by losing oxygen when she was younger. Mother recognizes that she may be "slow" as compared to the average person but asserts that she is able to understand how to parent and discipline the Children. *Id*. at 7. Mother was employed for a short time but was unemployed at the time of the termination hearing. Mother resides in an apartment in Franklin and receives approximately $750 a month in disability benefits. Prior to DCS involvement, Mother recognized that she was struggling with stress and, on her own, sought help from Mary Beth Mahan, a licensed mental health counselor and a licensed clinical addiction counselor. Mahan worked with Mother on dealing with stress and better parenting. Mahan saw Mother on and off throughout DCS's involvement. Mahan was of the opinion that Mother had the ability to care for Child on her own. After having partially observed ten to twelve of Mother's supervised visits, Mahan testified that she has "no concerns," safety or otherwise, with Child being in Mother's care. *Id*. at 90.

[19] At the conclusion of the evidence, the court took the matter under advisement. On December 4, 2018, the court entered its order terminating Mother's parental rights with regard to Child.[5] Mother now appeals. Additional facts will be provided as necessary.

---

[5] The trial court terminated Father's parental rights on November 13, 2018. Father does not participate in this appeal.

## Discussion & Decision

### 1. Exclusion of Evidence

[20] Mother argues that the court abused its discretion by prohibiting her from introducing evidence she claims was "highly probative of her fitness as a parent." *Appellant's Brief* at 15. Specifically, prior to the termination hearing, Mother sought to offer three exhibits, which were visitation reports written by Batts, Mother's most recent visitation supervisor. DCS objected to the reports on grounds that they were "uncertified, hearsay." *Transcript Vol. II* at 6. The court found that the documents were hearsay and ruled that they "will not be admitted." *Id*. At that time, Mother offered no alternative basis for admissibility of the documents. On appeal, Mother argues that her proffered exhibits were admissible under several different theories, including statement of a party opponent, pursuant to CHINS statutes, and out of fundamental fairness. She contends that exclusion of such evidence impacted her substantial rights.

[21] "In order to properly preserve an issue on appeal, a party must, at a minimum, 'show that it gave the trial court a bona fide opportunity to pass upon the merits of the claim before seeking an opinion on appeal.'" *In re B.R.*, 875 N.E.2d 369, 373 (Ind. Ct. App. 2007) (quoting *Cavens v. Zaberdac*, 849 N.E.2d 526, 533 (Ind. 2006)), *trans. denied*. Thus, issues not raised before the trial court are waived on appeal. *Id*. Mother did not present to the trial court the arguments she makes on appeal with regard to the admissibility of her proffered exhibits. Mother has therefore waived this issue for our review. *See Baxendale v. Raich*, 878 N.E.2d

1252, 1258 (Ind. 2008) (when there is "no showing what the anticipated evidence would have been," an argument for admission of evidence is precluded on appeal).

## 2. Sufficiency

[22]  In challenging the court's termination order, Mother first argues that the court's findings are insufficient because the court—in Findings 13, 17, 18, and 22—merely recited the testimony presented at the hearing. The challenged findings provide:

> 13.  The major concern of the IDCS and Guardian ad Litem is [Mother]'s ability to adequately and safely parent a child due to her comprehension problems.
>
> * * *
>
> 17.  Tenea Robinson worked with [Mother] while supervising parenting time from May of 2017 to May of 2018. Given the length of time and help given, with a lack of success, Ms. Robinson finds it questionable if [Mother] would be able to parent by herself.
>
> 18.  Parenting aid and visit supervisor Stacy Batts, who worked with [Mother] into August of 2018, has not seen anything that would lead her to believe that [Mother]'s parenting would work with [Child] or any of the children, and they could be placed in danger.
>
> * * *

> 22. During the CHINS proceeding, [Mother] was given the
> opportunity to have at least fifteen child and family team
> meetings at which time she was observed as struggling to
> understand information and being unable to summarize
> information provided.

*Appellant's Appendix Vol. II* at 58-59.

[23] The court is statutorily required to "enter findings of fact that support" termination of the parent-child relationship. Ind. Code § 31-35-2-8(c). We have held that "[a] court . . . does not find something to be a fact by merely reciting that a witness testified to X, Y, or Z. Rather, the trier of fact must find that what the witness testified to is the fact." *Moore v. Jasper Cty. Dep't of Child Servs.*, 894 N.E.2d 218, 224 (Ind. Ct. App. 2008) (quoting *In re T.J.F.*, 798 N.E.2d 867, 874 (Ind. Ct. App. 2003)). The trial court's findings, set forth above, are not a mere recitation of testimony presented at the hearing. It can be inferred from the court's findings that the court adopted the testimony of the witnesses. There is no error in this regard.

[24] Mother also argues that several of the court's findings as not being supported by the evidence. Mother first challenges Finding 26, which provides:

> 26. On March 5, 2018, the CHINS Court changed [Child]'s
> plan for permanency to adoption with the Court finding,
> in-part, that [Mother] still needed consistent prompting
> and reminders for basic parental needs.

*Appellant's Appendix Vol. II* at 59. Mother asserts that this finding cannot support termination because it is based on a finding in the CHINS action,

which has a lower burden of proof. Mother's challenge in this respect is unavailing. In Finding 26, the court simply stated when and why the permanency plan was changed to adoption. Further, the permanency order was admitted as an exhibit without any objection from Mother.

[25] Mother also claims that the evidence does not support Finding 19—in which the trial court found: "Due to the chaos that erupted during parenting time, [Mother] now has sessions with [Child] separately." *Id*. We disagree. GAL Ankney and Walkey-Thornburgh both testified as to the chaos that occurred during Mother's visits with the Children. FCM Lee also testified that because of Mother's inability to control the Children when they were all together, Mother's visits were changed so that she could visit each child separately. The court's Finding 19 is supported by the evidence.

[26] Finally, Mother challenges Finding 23 and Finding 25 as not supported by clear and convincing evidence. Specifically, with regard to the former, the court found that "[s]afety concerns extend to who [Mother] would allow around [Child], and [Mother]'s ability to understand why certain individuals would present as safety concerns." *Id*. As set forth above, there was testimony about safety concerns that arose when, during her unsupervised visits, Mother permitted an unidentified man to be around Child and that Mother also had others in her home when Child was present.

[27] In Finding 25, the court found that Mother "does not believe she needs services but also believes she needs another year to reunify with [Child]." *Id*. We read

such as being consistent with Mother's testimony, wherein she stated that she wanted to prove to DCS that she could be a better parent. Finding 23 and Finding 25 are supported by evidence in the record.

[28] Mother next argues that the statutory elements to terminate Mother's parental rights to Child were not established by clear and convincing evidence. When reviewing the termination of parental rights, we will not reweigh the evidence or judge the credibility of the witnesses. *In re D.D.*, 804 N.E.2d 258, 265 (Ind. Ct. App. 2004), *trans. denied*. Instead, we consider only the evidence and reasonable inferences most favorable to the judgment. *Id*. In deference to the trial court's unique position to assess the evidence, we will set aside its judgment terminating a parent-child relationship only if it is clearly erroneous. *In re L.S.*, 717 N.E.2d 204, 208 (Ind. Ct. App. 1999), *trans. denied*. Thus, if the evidence and inferences support the decision, we must affirm. *Id*.

[29] Before an involuntary termination of parental rights may occur in Indiana, DCS is required to allege and prove by clear and convincing evidence, among other things:

> (B) that one (1) of the following is true:
>
>> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

(ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

(iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services[.]

Ind. Code § 31-35-2-4(b)(2)(B). DCS must also prove by clear and convincing evidence that termination is in the best interests of the child. I.C. § 31-35-2-4(b)(2)(C).

[30] Mother challenges the court's findings as to subsection (b)(2)(B)(i) and (ii). We note that DCS was required to establish only one of the three requirements of I.C. § 31-35-2-4(b)(2)(B) by clear and convincing evidence before the court could terminate parental rights. *See In re L.V.N.*, 799 N.E.2d 63, 69 (Ind. Ct. App. 2003). We focus our inquiry on the trial court's conclusion under subsection (b)(2)(B)(i)—that is, whether a reasonable probability exists that the conditions resulting in Child's removal and continued placement outside the home will not be remedied.

[31] In making this determination the trial court must judge a parent's fitness to care for her child at the time of the termination hearing, taking into consideration evidence of changed conditions. *A.B. v. Ind. Dep't of Child Servs.*, 61 N.E.3d 1182, 1189 (Ind. Ct. App. 2016). The court may also consider the parent's response to the services offered through DCS. *Lang v. Starke Cty. Office of Family & Children*, 861 N.E.2d 366, 372 (Ind. Ct. App. 2007), *trans. denied*.

[32] Each DCS service provider testified that Mother had made no progress and that she continues to struggle with her ability to safely parent Child. They all expressed concern for Child's safety if he were to be returned to Mother's care. According to FCM Lee, Mother has not made any progress in terms of her ability to parent Child, despite over two years of services. FCM Lee expressed concern that Mother would not be able to meet Child's needs without constant oversight of service providers and that she did not believe Mother was capable of making the needed progress if offered additional services. Batts, who noted some positive aspects of Mother's relationship with Child, was concerned for Mother to be alone with Child and that "without a watchful eye over [Mother], we would see her in the system again." *Transcript Vol. II* at 28. GAL Ankney testified that she feared for Child's safety because of Mother's inability to parent Child. GAL Ankney perhaps best described Mother's lack of parenting skills when she testified that Mother lacks "the simplest of natural instincts of … being a parent." *Id*. at 73-74. Service providers also expressed concerns that Mother would not be able to provide Child with adequate supervision, that she would allow inappropriate people to be around Child, and that she would not be able to provide for his most basic needs. During visits, Mother needed prompting and constant reminders to parent Child.

[33] Mother argues that the court should have considered her ability to parent only Child, taking B.W. and A.W. out of the equation. The majority of Mother's visitations were with all three children. Several service providers testified that Mother could not handle all three children at one time and that the visitations

were often chaotic. Even if Child was the sole child in Mother's care, the service providers' concerns about Mother's inability to parent Child remain. She is incapable of making appropriate parenting decisions to provide stability and safety for Child. In its effort to reunify Mother with Child, DCS conducted extra team meetings and service providers came up with alternative measures to help Mother parent Child. None of these efforts proved successful, however, as Mother continued to need reminding and prompting in terms of parenting Child after more than two years of services.

[34] Mother also argues that the court should have given more consideration in her favor to the fact that she voluntarily sought and participated in counseling services. Mother is to be commended for her efforts to seek out counseling, but her argument in this regard is simply a request for this court to reweigh the evidence, which we will not do.

[35] Based on the evidence presented at the termination hearing, the court found: "[Mother] has had two years of services, but due to an unfortunate inability to grasp and remember parenting skills, she has made little progress in being able to safely and adequately parent. [Child]'s needs will continue to change as he ages." *Appellant's Appendix Vol. II* at 59. This finding is supported by the evidence and supports the trial court's conclusion that there is a reasonable probability Mother will not remedy the conditions resulting in Child's continued placement outside the home.

[36]     Mother also argues that the trial court's conclusion that termination of her parental rights was in Child's best interests is not supported by clear and convincing evidence. In determining whether termination of parental rights is in the best interests of a child, the trial court is required to look beyond the factors identified by DCS and consider the totality of the evidence. *In re J.C.*, 994 N.E.2d 278, 290 (Ind. Ct. App. 2013). In so doing, the trial court must subordinate the interest of the parent to those of the child, and the court need not wait until a child is irreversibly harmed before terminating the parent-child relationship. *McBride v. Monroe Cty. Office of Family & Children*, 798 N.E.2d 185, 199 (Ind. Ct. App. 2003). Our Supreme Court has explained that "[p]ermanency is a central consideration in determining the best interests of a child." *In re G.Y.*, 904 N.E.2d 1257, 1265 (Ind. 2009).

[37]     We have held that "the recommendations of the case manager and court-appointed advocate to terminate parental rights, in addition to evidence that the conditions resulting in removal will not be remedied, is sufficient to show by clear and convincing evidence that termination is in the child's best interests." *In re J.S.*, 906 N.E.2d 226, 236 (Ind. Ct. App. 2009). Here, FCM Lee and GAL Ankney both recommended termination of Mother's parental rights to Child. Both service providers were of the opinion that Mother had made no progress in terms of her ability to parent Child in over two years, and therefore, Child's need for permanency was now the central consideration. This is sufficient to support the court's conclusion that termination is in Child's best interests.

[38] We recognize that the traditional right of parents to "establish a home and raise their children is protected by the Fourteenth Amendment of the United States Constitution." *In re M.B.*, 666 N.E.2d 73, 76 (Ind. Ct. App. 1996), *trans. denied*. Although parental rights are of constitutional dimension, the law provides for the termination of these rights when parents are *unable* or unwilling to meet their parental responsibilities. *In re R.H.*, 892 N.E.2d 144, 149 (Ind. Ct. App. 2008). In addition, a court must subordinate the interests of the parents to those of the child when evaluating the circumstances surrounding the termination. *In re K.S.*, 750 N.E.2d 832, 836 (Ind. Ct. App. 2001). The purpose of terminating parental rights is not to punish the parents, but to protect their children. *Id.* We have no doubt that there is a bond between Mother and Child, and we recognize that Mother has participated in the court-ordered services. However, Mother has been unable to successfully demonstrate an ability to safely parent Child.

[39] Contrary to Mother's assertion, termination was not simply based on Mother's parenting style in a generic sense. While some service providers described Mother as having a permissive parenting style, the service providers consistently expressed concern that Mother is incapable of parenting Child and providing a safe environment.

[40] The trial court listened to the testimony of all witnesses, observed their demeanor, and judged their credibility. As a reviewing court we must give proper deference to the trial court. *In re T.F.*, 743 N.E.2d 766, 776 (Ind. Ct. App. 2001), *trans. denied*. Based on the totality of the evidence, we conclude

that the evidence supports the trial court's determination that termination of Mother's parental rights was in Child's best interests.

Judgment affirmed.

Kirsch, J. and Vaidik C.J., concur.